JRS:DR/IC
F. #2019R01386

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                         No. 22-CR-194 (EK)

ANTHONY ROMANELLO,
       also known as "Rom," and
JOSEPH CELSO,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MOTIONS <u>IN LIMINE</u> TO ADMIT CERTAIN EVIDENCE
AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS AT TRIAL

BREON PEACE
United States Attorney
Eastern District of New York

Dana Rehnquist
Irisa Chen
Assistant United States Attorneys
     (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 1

ARGUMENT ........................................................................................................................ 5

I.    Statements By the Defendants and Among Co-Conspirators Are Admissible .................. 5

      A.    Applicable Law ........................................................................................... 7

      B.    Romanello's Post-Arrest Statements Are Admissible Against Romanello .......... 13

      C.    Celso's 2019 Statements Are Admissible Against Celso .................................... 16

      D.    Co-conspirators Statements Are Admissible Against Both Defendants............... 16

      E.    Additional Portions of Defendants' Statements Are Inadmissible If Offered by
            Defendants ........................................................................................... 21

II.   Intercepted Phone Communications May Be Authenticated Through Testimony of a
      Witness Familiar with a Speaker's Voice......................................................... 24

III.  Evidence of the Defendants' Reputation and the Reputation of Co-Conspirators is
      Admissible ........................................................................................... 26

IV.   Evidence or Argument Suggesting Selective Prosecution or Impugning the Government's
      Investigatory Conduct Should Be Precluded ................................................... 30

V.    Defendants Should Disclose Rule 16(b) Discovery and Trial Exhibits To Be Introduced
      During the Government's Case....................................................................... 33

VI.   Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded ............... 35

VII.  Certain Business and Public Records Are Admissible ..................................... 37

VIII. Evidence or Argument Concerning Possible Punishment and Collateral Consequences
      Should Be Precluded........................................................................... 41

CONCLUSION................................................................................................ 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Bourjaily v. United States</u>,
    483 U.S. 171 (1987) ............................................................................................ 8, 11

<u>Edwards v. Arizona</u>,
    451 U.S. 477, (1981) ................................................................................................. 15

<u>Funk v. Belneftekhim</u>,
    No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018) ............................ 23

<u>Melendez-Diaz v. Massachusetts</u>,
    557 U.S. 305 (2009) ............................................................................................ 38, 39

<u>Miranda v. Arizona</u>,
    384 U.S. 436 (1996) ................................................................................................. 15

<u>Old Chief v. United States</u>,
    519 U.S. 172 (1997) ................................................................................................... 7

<u>Palermo v. United States</u>,
    360 U.S. 343 (1959) ............................................................................................ 36, 37

<u>Quartararo v. Hanslmaier</u>,
    186 F.3d 91 (2d Cir. 1999) ......................................................................................... 11

<u>Rogers v. United States</u>,
    422 U.S. 35 (1975) ................................................................................................... 41

<u>Shephard v. United States</u>,
    290 U.S. 96 (1933) ................................................................................................... 23

<u>United States v. Aiyaswamy</u>,
    No. 15-CR-568 (LHK), 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) .............................. 35

<u>United States v. Alamonte</u>,
    956 F.2d 27 (2d Cir. 1992) .................................................................................... 36, 37

<u>United States v. Albergo</u>,
    539 F.2d 860 (2d Cir. 1976) .................................................................................. 25, 26

<u>United States v. Amato</u>,
    15 F.3d 230 (2d Cir. 1994) .......................................................................................... 9

United States v. Amodeo,
    44 F.3d 141 (2d Cir. 1995)................................................................................ 3

United States v. Armstrong,
    517 U.S. 456 (1996)....................................................................................... 32

United States v. Arrington,
    867 F.2d 122 (2d Cir. 1989)........................................................................... 10

United States v. Barone,
    913 F.2d 46 (2d Cir. 1990)......................................................................... 6, 11

United States v. Bellomo,
    176 F.3d 580 (2d Cir. 1999)........................................................................... 11

United States v. Blake,
    195 F. Supp. 3d 605 (S.D.N.Y. 2016)............................................................ 22

United States v. Blume,
    967 F.2d 45 (2d. Cir. 1992)............................................................................ 41

United States v. Bruton,
    391 U.S. 123 (1968)....................................................................................... 14

United States v. Cambindo Valencia,
    609 F.2d 603 (2d Cir. 1979)........................................................................... 26

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000)............................................................................. 27

United States v. Cardascia,
    951 F.2d 474 (2d Cir. 1991)........................................................................... 23

United States v. Choudhry,
    24 F. Supp. 3d 273 (E.D.N.Y. 2014) ............................................................. 15

United States v. Cohen,
    372 F. Supp. 2d 340 (E.D.N.Y. 2005) ........................................................... 15

United States v. Curcio,
    310 F. Supp. 351 (D. Conn. 1970)................................................................. 28

United States v. Davidson,
    308 F. Supp. 2d 461 (S.D.N.Y. 2004)............................................................ 22

United States v. Davis,
    890 F.2d 1373 (7th Cir. 1989) ................................................... 6, 11

United States v. Deluna,
    38 F. App'x 644 (2d Cir. 2002) ..................................................... 12

United States v. Demosthene,
    334 F. Supp. 2d 378 (S.D.N.Y. 2004) ............................................ 33

United States v. Dennis,
    625 F.2d 782 (8th Cir. 1980) ................................................... 29, 30

United States v. Detrich,
    865 F.2d 17 (2d Cir. 1988) ..................................................... 6, 11

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001) ................................................... 25, 26

United States v. Dominguez-Gabriel,
    511 F. App'x 17 (2d Cir. 2013) .................................................... 11

United States v. Dunloy,
    584 F.2d 6 (2d Cir. 1978) ..................................................... 6, 11

United States v. Dupree,
    870 F.3d 62 (2d Cir. 2017) ......................................................... 12

United States v. Eisen,
    974 F.2d 246 (2d Cir. 1992) ....................................................... 10

United States v. Ellis,
    460 F.3d 920 (7th Cir. 2006) ...................................................... 39

United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011) ....................................................... 32

United States v. Gigante,
    166 F.3d 75 (2d Cir. 1998) ...................................................... 8, 9

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997) .................................................... 7, 27

United States v. Gonzalez,
    399 F. App'x 641 (2d Cir. 2010) ................................................... 24

United States v. Gotti,
    457 F. Supp. 2d 395 (S.D.N.Y. 2006)...................................................................23

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014)............................................................................12

United States v. Hamilton,
    503 F. Supp. 2d 563 (E.D.N.Y. 2007) ...............................................................15

United States v. Harper,
    No. 05-CR-6068L, 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009)...........................24

United States v. Holden,
    No. 13-CR-444, 2015 WL 1514569 (D. Or. Mar 19, 2015)..................................35

United States v. Howard,
    998 F.2d 42 (2d Cir. 1993)..............................................................................14

United States v. Hsia,
    No. 98-CR-57 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) ...........................34

United States v. Huang,
    101 F.3d 1392, 1996 WL 387221 (2d Cir. 1996) ...............................................25

United States v. Huntress,
    No. 13-CV-199S, 2015 WL 631976 (W.D.N.Y. Feb. 13, 2015)............................35

United States v. Jackson,
    180 F.3d 55 (2d Cir. 1999)..............................................................................24

United States v. Jadusingh,
    No. 18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020) ....................41

United States v. Jefferson,
    215 F.3d 820 (8th Cir. 2000) ..........................................................................10

United States v. Johnson,
    688 F.3d 494 (8th Cir. 2012) ..........................................................................39

United States v. Johnson,
    507 F.3d 793 (2d. Cir. 2007)...........................................................................24

United States v. Kahale,
    789 F. Supp. 2d 359 (E.D.N.Y. 2009) ...............................................................10

United States v. Knox,
   687 F. App'x 51 (2d Cir. 2017) ............................................................. 32

United States v. Komasa,
   767 F.3d 151 (2d Cir. 2014)..................................................................... 39

United States v. Kone,
   216 F. App'x 74 (2d Cir. 2007) ............................................................... 7

United States v. Kurland,
   No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ........................... 9

United States v. Larkin,
   No. 12-CR-319 (GWF), 2015 WL 4415506 (D. Nev. July 20, 2015).................................... 35

United States v. Leonardi,
   623 F.2d 746 (2d Cir. 1980)................................................................. 36, 37

United States v. Loera,
   No. 09-CR-466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018).................................... 32

United States v. Mahaffy,
   No. 05-CR-613, 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) ................................... 22

United States v. Maldonado-Rivera,
   922 F.2d 934 (2d Cir. 1990)..................................................................... 8

United States v. Malka,
   No. 19-CR-497 (NSR), 2022 WL 1488568 (S.D.N.Y. May 11, 2022) ......................... 9, 10, 13

United States v. Marin,
   669 F.2d 73 (2d Cir. 1982)..................................................................... 22

United States v. McDaniel,
   398 F.3d 540 (6th Cir. 2005) ............................................................... 22

United States v. Melia,
   No. 11-CR-60, 2011 WL 3880922 (D. Conn. Sept. 2, 2011) ................................... 30

United States v. Mermelstein,
   487 F. Supp. 2d 242 (E.D.N.Y.2007) ......................................................... 10

United States v. Michel,
   879 F. Supp. 2d 291 (E.D.N.Y. 2012) ....................................................... 40

United States v. Miller,
116 F.3d 641 (2d Cir. 1997)................................................................................. 15

United States v. Milstein,
401 F.3d 53 (2d Cir. 2005)............................................................................. 10, 19

United States v. Moreno,
108 F.3d 1370, 1997 WL 138435, at *3 (2d Cir. 1997) ................................. 25, 26

United States v. Morgan,
505 F.3d 332 (5th Cir. 2007) ............................................................................... 39

United States v. Napout,
No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017)................... 34

United States v. Natale,
526 F.2d 1160 (2d Cir. 1975).......................................................................... 28, 29

United States v. Ortiz,
776 F.3d 1042 (9th Cir. 2015) ............................................................................. 25

United States v. Pacione,
738 F.2d 567 (2d Cir. 1984).................................................................... 28, 29, 30

United States v. Persico,
645 F.3d 85 (2d Cir. 2011).................................................................................. 12

United States v. Pikus,
No. 16-CR-329 (AMD), 2019 WL 8113500 (E.D.N.Y. Nov. 15, 2019)................ 15

United States v. Polizzi,
801 F.2d 1543 (9th Cir. 1986) ................................................................. 28, 29, 30

United States v. Preldakaj,
456 F. App'x 56 (2d Cir. 2012) ........................................................................... 32

United States v. Qualls,
613 F. App'x 25 (2d Cir. 2015) ........................................................................... 39

United States v. Rahme,
813 F.2d 31 (2d Cir. 1987).................................................................................... 9

United States v. Reese,
933 F. Supp. 2d 579 (S.D.N.Y. 2013)................................................................. 33

United States v. Regan,
    103 F.3d 1072 (2d Cir. 1997).................................................................... 32

United States v. Rivera,
    22 F.3d 430 (2d Cir. 1994)......................................................................... 9

United States v. Rom,
    528 F. App'x 24 (2d Cir. 2013) ............................................................... 40

United States v. Rosado,
    728 F.2d 89 (2d Cir.  1984) ...................................................................... 31

United States v. Russo,
    302 F.3d 37 (2d Cir. 2002)..................................................................... 8, 9

United States v. Saget,
    377 F.3d 223 (2d Cir. 2004).............................................................. 11, 13

United States v. Saldarriaga,
    204 F.3d 50 (2d Cir. 2000)................................................................ 31, 32

United States v. Salerno,
    868 F.2d 524 (2d Cir. 1987) .................................................................... 10

United States v. Sasso,
    59 F.3d 341 (2d Cir. 1995)....................................................................... 13

United States v. Schlesinger,
    372 F. Supp. 711 (E.D.N.Y. 2005) ......................................................... 10

United States v. Sears,
    544 F.2d 585 (2d Cir. 1976)..................................................................... 28

United States v. Smothers,
    No. 20-CR-213 (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) ..................................... 34

United States v. Stewart,
    433 F.3d 273 (2d Cir. 2006)................................................................. 9, 14

United States v. Stewart,
    No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)................................... 33

United States v. Swenson,
    298 F.R.D. 474 (D. Idaho 2014) .............................................................. 35

United States v. Tellier,
    83 F.3d 578 (2d Cir. 1996)......................................................................... 8

United States v. Towne,
  870 F.2d 880 (2d Cir. 1989) ......................................................................... 27

United States v. Tyrell,
  840 F. App'x 617 (2d Cir. 2021) ................................................................. 13

United States v. Weiland,
  420 F.3d 1062 (9th Cir. 2005) ..................................................................... 39

United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008) ......................................................................... 13

United States v. Yeley-Davis,
  632 F.3d 673 (10th Cir. 2011) ..................................................................... 39

United States v. Yousef,
  327 F.3d 56 (2d Cir. 2003) ........................................................................... 22

**Statutes**

18 U.S.C. § 891(7) .......................................................................................... 28

18 U.S.C. § 894 .................................................................................. 2, 27, 28, 29

18 U.S.C. § 3500 ............................................................................................. 36

**Other Authorities**

2 Weinstein's Federal Evidence § 404.12[3] (2d ed. 2003) ......................... 27

5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008) ......................... 40

**Rules**

Fed. R. Crim. P. 16(b) .................................................................................... 33

Fed. R. Evid. 106 ........................................................................................... 23

Fed. R. Evid. 401 ..................................................................................... passim

Fed. R. Evid. 402 ................................................................................. 7, 26, 41

Fed. R. Evid. 403 ........................................................................................... 15

Fed. R. Evid. 613 ..................................................................................... 35, 36

Fed. R. Evid. 801(c) .................................................................................................... 7

Fed. R. Evid. 801(d)(2)(A) ..................................................................................... 7, 13

Fed. R. Evid. 801(d)(2)(E) ........................................................................................... 8

Fed. R. Evid. 802 ........................................................................................................ 7

Fed. R. Evid. 803(3) .................................................................................................. 23

Fed. R. Evid. 803(6) ........................................................................................ 38, 39, 40

Fed. R. Evid. 901 .................................................................................................. 25, 26

Fed. R. Evid. 902(1) .................................................................................................. 41

Fed. R. Evid. 902(11) ...................................................................................... 38, 39, 40

PRELIMINARY STATEMENT

The government respectfully moves in limine to:

(1) admit certain statements by defendants and co-conspirators as party admissions, co-conspirator statements or statements against penal interest;

(2) permit the government to authenticate wiretap recordings through a witness familiar with the speaker's voice on the recordings;

(3) admit evidence concerning the reputations of the defendants and co-conspirators;

(4) preclude evidence or argument suggesting selective prosecution or challenging the government's investigatory conduct;

(5) order defendants to disclose Rule 16(b) discovery and trial exhibits;

(6) preclude improper use of agent reports as impeachment evidence;

(7) admit certain evidence as business or public records; and

(8) preclude evidence or argument concerning possible punishment and collateral consequences.

For the reasons set forth herein, the government's motions in limine should be granted.

RELEVANT BACKGROUND[1]

On April 29, 2022, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment") charging Anthony Romanello and Joseph Celso with extortionate collection of credit and conspiracy to commit the same in and between March and June 2017 in

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial. In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony is a collection of the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through the respective of witness's anticipated testimony.

violation of Title 18, United States Code, Section 894(a).[2]  Celso was also indicted on one count of obstruction of justice, in violation of Title 18, United States Code, Section 1512(c), in relation to the extortionate scheme.

By way of background, at trial, the government intends to introduce evidence explaining generally how illegal sports gambling schemes operate and how debts incurred from these operations are collected.  In illegal sports gambling schemes, like the one at issue here, gamblers bet on credit—there is no money exchanged when a bet is placed.  This is unlike legal sports gambling businesses, which require gamblers to pay the money they wager when a bet is placed.  Because illegal sports gambling schemes operate on credit, individuals who keep track of the bets placed must collect debts owed by gamblers who lose on their bets, generally with the two parties' settling up on a weekly basis.  To ensure they can collect on these debts, these individuals or those they work with often pay a percentage of their proceeds to others with the understanding that those individuals will assist in the collection of outstanding debts from gamblers should the gamblers fail to pay, including by force, if necessary.  Thus, the illegal sports gambling scheme functions only by the concerted efforts of both those taking the bets on credit and those who collect owed money.

The government means to prove at trial that Romanello, Celso, Bexheti, and other

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████,[3] together

---

[2]      The Indictment also charges a third defendant Luan Bexheti with these offenses. On October 4, 2023, Bexheti pled guilty to conspiracy to engage in extortionate collection of credit. See Oct. 4, 2023 Minute Entry.

[3]      The government respectfully requests that this submission be filed under seal and

operated precisely such an illegal sports gambling scheme where bets were placed on credit, debts were settled-up on a weekly basis and individuals, including Romanello and Celso, were called-in to help collect on outstanding debts (the "gambling-credit collection conspiracy"). The charged extortionate collection of credit conspiracy (Count One) is a part of the broader gambling-credit collection conspiracy, in which the defendants and co-conspirators took part.

Specifically, in or about 2017, two individuals, John Doe #2 (as identified in the Indictment) and Individual-1, began placing sport bets with the defendants' co-conspirators, Luan Bexheti ███████████. Based on the arrangement with Bexheti ████████, John Doe #2 and Individual-1 placed bets on credit on a weekly basis with the amount won or owed to be settled by the next Wednesday or Thursday. At some point in or about February or March 2017, John Doe #2 and Individual-1 owed tens of thousands of dollars (the "Debt") but did not have the funds to pay back the Debt. At this time, Bexheti ██████████ unsuccessfully attempted to collect the debt from John Doe #2 and Individual-1, including through calls from Bexheti ██████████, including one, in which Bexheti stated, in sum and substance, that his boss was going to need to get involved, it is "serious shit" if they do not have the money, and if the money is not repaid then "the heat is on."[4] Feb. 28, 2017 Call #2966. Ultimately, Bexheti ███████████ were unable to collect the Debt at this time.

---

that portions of this submission pertaining to the testimony of one or more potential witnesses whose identities may be identified by information contained in the letter be redacted for public filing. The risk to the safety of these witnesses outweighs the public's right to disclosure. <u>United States v. Amodeo</u>, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation, including the safety of witnesses, may be compelling reason to justify sealing). Moreover, unsealing this letter, and thus potentially revealing witness identities publicly will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated, a fact that also weighs against public disclosure.

[4]       All transcriptions included herein are in draft form and are subject to revision.

In or around March 2017, Romanello and certain co-conspirators became involved in collecting the outstanding Debt.  Specifically, Romanello approached John Doe #2's family member ("John Doe #1") about the Debt ("Visit-1").  Romanello told John Doe #1 that John Doe #2 owed him (Romanello) $6,000 and Individual-1 owed him $80,000.  John Doe #1 told Romanello that he would talk to John Doe #2 about the Debt and promised the Debt would be repaid.  During the Visit, Romanello made clear to John Doe #1 that John Doe #1 was now being held responsible for the Debt as well.  Thereafter, John Doe #1 informed John Doe #2 about Visit-1 and John Doe #2 promised he would pay off the Debt.

A few weeks after Visit-1, Romanello, Bexheti and certain co-conspirators arrived at John Doe #1's place of business a second time ("Visit-2") and informed John Doe #1 that the Debt had not been repaid.  Romanello asked John Doe #1 if he spoke to John Doe #2, and John Doe #1 replied that he had and was told that the Debt was going to be repaid.

On May 11, 2017, Romanello and Celso, ███████████████ and Romanello's son, George Romanello, confronted John Doe #1 for a third time to induce payment of the Debt ("Visit-3").  During Visit-3, Romanello once again asked about the Debt, which had still not been repaid.  Shortly thereafter, and as captured by video surveillance, Romanello hit John Doe #1 in the face while Celso, ████ and George Romanello surround John Doe #1.  As captured on the surveillance footage, the co-conspirators walk forward as John Doe #1 is forced backward until other waitstaff at the restaurant became involved.  Romanello and the other co-conspirators then exited the restaurant.

Later that night, John Doe #1 went to the police station and filed a police report against Romanello.  Also that night, John Doe #1 met with John Doe #2, Individual-1 and another individual who knew Celso ("Individual-2"), among others, to discuss Visit-3 and what to do about

4

the Debt.  At this meeting, it was decided that a relative of Individual-1 ("Individual-3")[5] would provide money to Individual-2 to cover Individual-1's portions of the debt and that Individual-2 would coordinate with Celso and his co-conspirators to pay back the Debt.

The next day, on May 12, 2017, Individual-2 informed John Doe #1 that he spoke to Celso and Celso told him that John Doe #1 should drop the charges against Romanello otherwise the situation could escalate.  As a result, John Doe #1 then went to the police station and withdrew the police report against Romanello.

Thereafter, John Doe #1 and Individual-2 coordinated with Celso to repay the Debt, which was eventually repaid in full.

In November 2019, and providing the basis for Count Two, the government will prove at trial that Individual-2 was served with a grand jury subpoena in relation to the instant case.  Individual-2 informed Celso that he received a subpoena and in response, Celso told Individual-2 to tell the Federal Bureau of Investigation ("FBI") the truth, but not to tell the FBI about Celso's involvement in collecting the Debt owed to the gambling-credit collection conspiracy.

<u>ARGUMENT</u>

I.     <u>Statements By the Defendants and Among Co-Conspirators Are Admissible</u>

The government respectfully moves to admit at trial statements made by the defendants and certain co-conspirators that were made during and in furtherance of the gambling-credit collection conspiracy, among other things. The government anticipates admitting various statements by the defendants and co-conspirators, including, but not limited to: (1) statements by the defendants admissible against the declarant only; (2) statements by the defendants and co-

---

[5]     "Victims" will herein refer to John Doe #1, John Doe #2, Individual-1, Individual-2 and Individual-3.

conspirators discussing the gambling-credit collection conspiracy admissible against both defendants;[6] and (3) statements by Celso and certain co-conspirators after Visit-3 discussing the assault of John Doe #1 and the withdrawal of the police report also admissible against both defendants.[7]   As a practical matter, the government anticipates that the context in which certain of the defendants' and co-conspirator statements are offered at trial will make clear that the statements were in furtherance of the gambling-credit collection conspiracy.  These statements are admissible because they are direct evidence of the charged crimes, and either are not hearsay or fall within an exception to the hearsay rule under the Federal Rules of Evidence.[8]

---

[6]     As discussed above, statements by the defendants also constitute party-opponent admissions when admitted against the defendant who made the statement.  But they are separately admissible against other co-defendants pursuant to the co-conspirator statement exclusion from hearsay.

[7]     The government anticipates that these statements will be admitted through intercepted phone communications and witness testimony.  The government has produced the intercepted phone communications in its possession, RBC003870-3878, and made an additional production of a subset communications the government has previously identified as relevant, RBC003901-3916.  As the government continues to identify relevant communications it intends to use at trial, it will identify those communications to defense counsel.  The examples included herein are illustrative of the types of communications the government intends to introduce and the relevant hearsay exceptions that apply. See, e.g., Jan. 19, 2017 Call #12251, Jan. 19, 2017 Call #12303, Jan 19, 2017 Call #12278, Jan. 19, 2017 Call #12332, Feb. 13, 2017 Call #52; Feb. 14, 2017 Call #56, Feb. 20, 2017 Call #306, Feb. 28, 2017 Call #2966, Mar. 6, 2017 Call #427, Mar 6, 2017 Call #4264, Mar. 6, 2017 Text #4378, Mar. 6, 2017 Call #4381, Mar. 7, 2017 Call #4671, Mar. 7, 2017 Call #4669, Apr. 5, 2017 Call #1911, May 11, 2017 Call #17296, May 12, 2017 Call #17452, May 14, 2017 Call #2182, May 15, 2017 Call #18106, May 15, 2017 Call #2200 and May 22, 2017 Call #2222.

[8]     The government also anticipates introducing certain of the Victims' statements, through intercepted text messages and phone call recordings as well as witness testimony.  These statements are admissible as they are probative of the Victims' state of mind at the time, see United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988); United States v. Dunloy, 584 F.2d 6, 11 (2d Cir. 1978), and moreover, the Victims' statements are necessary context for the statements of the conspirators with whom they were communicating, see United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

A.      Applicable Law

1.      Relevance

Under Federal Rule of Evidence 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  "Relevant evidence is admissible" unless specifically excluded by law or the rules.  Fed. R. Evid. 402.  In analyzing relevancy, the Second Circuit has explained that "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).  In sum, the Federal Rules of Evidence establish a liberal standard of admissibility.

2.      Hearsay

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.

a.      Non-Hearsay

Not all out-of-court statements offered for their truth are hearsay.  First, out-of-court statements made by the defendant are not hearsay when introduced by the government in a criminal trial to prove the truth of the facts stated therein because they are admissions of an adverse party.  See Fed. R. Evid. 801(d)(2)(A); see United States v. Kone, 216 F. App'x 74, 76 (2d Cir.

7

2007) ("'Statements made by the defendant,' where relevant, 'may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.'" (quoting United States v. Russo, 302 F.3d 37, 43 (2d Cir. 2002)).

   Second, Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy."  A co-conspirator statement may be admitted by the government if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the defendant were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171 (1987); see also United States v. Gigante, 166 F.3d 75 (2d Cir. 1998).  While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy."  Gigante, 166 F.3d at 82 (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)).

   With respect to the first requirement, the conspiracy in which the defendant and the declarant are engaged "need not be the crime charged in the indictment" for the statements to be admissible.  Russo, 302 F.3d at 45.  It is sufficient that the defendant and the declarant were in a conspiracy together.  Id.  Additionally, "to become a member of the conspiracy, a defendant need not have known the identities of every or have been apprised of all of their activities.  Moreover, a defendant need not have been informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part."  Jury Charge, United States v. Zottola, et al., No. 18-CR-609 (HG) (E.D.N.Y.); see United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (There is no requirement that the evidence show that the conspirators "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.") (internal

citations omitted); <u>United States v. Chartier</u>, No. 17-CR-372 (JS), 2021 WL 3795352, at *38 (E.D.N.Y. Aug. 26, 2021) (finding that "[c]o-conspirators' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.") (internal citations and quotation omitted).

As to the second "requirement that the challenged statement be 'in furtherance of' the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" <u>United States v. Malka</u>, 602 F. Supp. 3d 510, 535 (S.D.N.Y. 2022) (quoting <u>United States v. Rivera</u>, 22 F.3d 430, 436 (2d Cir. 1994)). Courts in this district have repeatedly held that this standard is "is not very restrictive." <u>United States v. Kurland</u>, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022) (citing <u>Malka</u>, 602 F. Supp. 3d at 535)). "[S]tatements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." <u>Gigante</u>, 166 F.3d at 82. "This can include those statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." <u>Id.</u>; <u>see also</u> <u>Russo</u>, 302 F.3d at 46 (statements which "inform . . . [coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"); <u>United States v. Rahme</u>, 813 F.2d 31, 36 (2d Cir. 1987) (Statements "that apprise a co-conspirator of the progress of the conspiracy" are in furtherance of the conspiracy.). Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). <u>United States v. Amato</u>, 15 F.3d 230, 234 (2d Cir. 1994); <u>see also</u> <u>United States v. Stewart</u>, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the

conspiracy); see also United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005). Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy." Malka, 602 F. Supp. 3d at 535  (internal citations omitted).

Statements apprising co-conspirators of past events also often further the conspiracy.  See, e.g., United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." (internal quotation marks omitted)); United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).  Even after members of a conspiracy have committed crimes leading to the arrest of many of its members, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989) (admitting co-conspirator statements made after conspirators were arrested and incarcerated).

In addition, acts taken to conceal an ongoing conspiracy are acts in furtherance of that conspiracy and, therefore, are relevant and admissible at trial.  See United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359, 384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); United States v. Mermelstein, 487 F. Supp. 2d 242, 261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it." (citing United States v. Milstein, 401 F.3d 53, 72 (2d Cir. 2005)).

Where co-conspirator statements are non-testimonial, there is no Confrontation Clause concern in the admission of co-conspirator statements.  See United States v. Saget, 377 F.3d 223, 228-30 (2d Cir.), supplemented, 108 F. App'x 667 (2d Cir. 2004) (analyzing Bourjaily, 483 U.S. 171, identifying as testimonial "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in later judicial proceedings.").

Third, statements that are not being offered for their truth also are not hearsay.  For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind, rather than for their truth.  Detrich, 865 F.2d at 21; Dunloy, 584 F.2d at 11.  Similarly, questions or commands do not generally constitute hearsay. See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Dominguez-Gabriel, 511 F. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999).  Finally, when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context.  See Barone, 913 F.2d at 49; Davis, 890 F.2d at 1373.

### b.    Statements Against Penal Interest – Rule 804(b)(3)

Statements made against a declarant's own penal interest are admissible pursuant to Federal Rule of Evidence 804(b)(3).  Rule 804(b)(3) provides that, where the declarant is unavailable, a statement is "not excluded by the rule against hearsay" if it is one that: "(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3).

11

A declarant is "unavailable" for purposes of this rule the declarant would invoke his privilege against self-incrimination, see, e.g., Fed. R. Evid. 804(a)(1) (noting that declarant "is considered to be unavailable as a witness" where a privilege applies); United States v. Deluna, 38 F. App'x 644, 645 (2d Cir. 2002) (upholding admission of coconspirator statement where coconspirator "was unavailable to testify as he would have invoked his Fifth Amendment privilege against self-incrimination").[9]

If the declarant is unavailable, the court must undertake a two-step analysis to determine admissibility.  United States v. Dupree, 870 F.3d 62, 80 (2d Cir. 2017).  First, the court "conducts an adequately particularized analysis to determine whether a reasonable person in the declarant's shoes would have perceived the statement as detrimental to his or her own penal interest in light of all the surrounding circumstances."  Id. (internal quotation, alterations and citations omitted).  The statement "need not have been sufficient, standing alone, to convict the declarant of any crime."  Id. (internal quotations, citations and alterations omitted).  Instead, Rule 804(b)(3) encompasses disserving statements by a declarant that would have probative value in a trial against the declarant.  See, e.g., id.; United States v. Gupta, 747 F.3d 111, 127 (2d Cir. 2014); United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011).  Nor does the Rule "require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution."  Persico, 645 F.3d at 102 (quotation marks omitted).

Second, the court "looks for corroborating circumstances indicating both the declarant's trustworthiness and the truth of the statement."  Id. (internal quotation and citations omitted).  Circumstances indicating trustworthiness include where (1) the declarant equally

---

[9]     The government is not yet certain whether co-conspirators would be unavailable to testify, as described above, but raises the admissibility of such co-conspirators' statements at this juncture in an abundance of caution.

inculpates himself along with the defendant and does not engage in blame-shifting or role-minimizing; (2) there is no apparent self-interested motive for the declarant to inculpate the defendant; (3) there is no coercion present; (4) the statement was made to a person whom the declarant believes is an ally.  See, e.g., United States v. Tyrell, 840 F. App'x 617, 622 (2d Cir. 2021); Saget, 377 F.3d at 230; United States v. Sasso, 59 F.3d 341, 349-50 (2d Cir. 1995).

Finally, it is well established that statements against penal interest not made to law enforcement are typically not testimonial and thus do not implicate the Confrontation Clause.  See, e.g., United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008) ("Whatever the contours of the definition of "testimonial," it seems clear to us that statements against penal interest of the type made by Abler do not fall within them." (internal citation omitted)); Tyrell, 840 F. App'x at 623 ("Our court has held that the confrontation clause has no applicability outside of testimonial statements, including in a situation where a defendant's non-testimonial self-incrimination implicates another defendant."); Malka, 602 F. Supp. 3d at 535 ("[B]ecause statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause.").

B.    Romanello's Post-Arrest Statements Are Admissible Against Romanello

The government generally may introduce a defendant's statements into evidence because a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2)(A).  These statements are well-within the purview of Rule 801(d)(2)(A) and thus are admissible.

First, the government intends to offer statements made by Romanello to the FBI following his arrest in this case.  These statements, which are attached in redacted form hereto as Exhibit 1 include unsolicited statements made by Romanello to law enforcement about a $70,000 debt, Romanello's efforts to "intervene" to ensure the debt was repaid ("try to work it out"), that

13

"they" won $70,000 the month before and admissions by Romanello that he became angry when he was told he was not going to be repaid and that he then "punched the Albanian in the mouth." Romanello also stated during this time that he "recognized the guy in the red shirt." At trial, the evidence will establish that "the guy in the red shirt" was Bexheti. Since Romanello's post-arrest statements do not reference any co-defendant, namely, Celso, the admissibility of these statements fully comport with Bruton v. United States, 391 U.S. 123, 128 (1968), as long as they are accompanied by an appropriate limiting instruction making clear the statements are admitted only as to Romanello, and are otherwise admissible as statements under Rule 801(d)(2)(A). See Stewart, 433 F.3d at 290 (testimonial statements "involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings.") (internal quotations and citation omitted).

Relatedly, any argument or assertion by defense counsel at trial that Romanello's statements were unlawfully or improperly elicited should be precluded. First, defense counsel has been in possession of Romanello's post-arrest statements since June 27, 2022. Since that time, defense counsel has filed a motion to dismiss the Indictment, but made no other motions, including any motion to suppress Romanello's post-arrest statements. As such, the defendant has waived his right to raise this legal issue regarding suppression. See United States v. Howard, 998 F.2d 42, 52 (2d Cir. 1993) ("The failure to file a timely motion [to suppress] constitutes a waiver.").

Second, any such argument would not have led to the suppression of Romanello's post-arrest statements since "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by" Miranda v. Arizona, 384 U.S. 436 (1996). Miranda, 384 U.S. at 478. The same is true even after the accused has invoked his right to counsel.

14

"If, after receiving <u>Miranda</u> warnings and invoking the right to counsel, 'the accused himself initiates further communication, exchanges, or conversations with the police,' those unsolicited statements are admissible." <u>United States v. Miller</u>, 116 F.3d 641, 680 (2d Cir. 1997) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981)). Courts in this district have regularly admitted unsolicited statements made under those circumstances. <u>See, e.g.</u>, <u>United States v. Choudhry</u>, 24 F. Supp. 3d 273, 277, 280 (E.D.N.Y. 2014) (refusing to suppress spontaneous statements made during arrest processing, after accused invoked right to counsel); <u>United States v. Hamilton</u>, 503 F. Supp. 2d 563, 564–65 (E.D.N.Y. 2007) (same where statements were made moments after invoking right to counsel, while walking to and inside police car); <u>United States v. Cohen</u>, 372 F. Supp. 2d 340, 361 n.9 (E.D.N.Y. 2005) (same where statements were made en route to courthouse for defendant's arraignment and agent offered innocuous reply).

Third, such arguments are irrelevant under Federal Rule of Evidence 401. They have no bearing on the material facts the government will prove to demonstrate the defendant's guilt. <u>See</u> Fed. R. Evid. 401. Even if such arguments were relevant, putting them before the jury would be more prejudicial than probative. Fed. R. Evid. 403. They also risk confusing and misleading the jury. <u>Id.</u>

Lastly, these legal issues are outside the scope of what the jury should hear. Rather, matters going to the lawfulness of the defendant's post-arrest statements are "preliminary questions," which should have been determined by this Court prior to a jury trial. <u>See</u> Fed. R. Evid. 104. Permitting the argument that the defendant's post-arrest statement was unlawfully acquired would flout Rule 104 and would improperly invite a mini-trial on the scope of the Fifth Amendment. Such argument is outside the scope of the jury's role, which is to determine matters of fact. <u>See generally</u> <u>Stewart</u>, 433 F.3d at 313; <u>see also</u> Jury Instructions, <u>United States v. Pikus</u>,

No. 16-CR-329 (AMD), 2019 WL 8113500 (E.D.N.Y. Nov. 15, 2019) ("[A]ny evidence that was presented to you was obtained legally and you can consider it.").

Accordingly, the Court should allow the government to admit Romanello's post-arrest statements against Romanello and preclude the defendant from arguing or otherwise asserting or suggesting at trial that the defendant's post-arrest statement was unlawfully or improperly elicited.

C.     Celso's 2019 Statements Are Admissible Against Celso

Similarly, the government intends to introduce certain statements Celso made in furtherance of the obstruction charge (Count Two) against Celso.  These include statements by Celso that Individual-2 should not inform the FBI about Celso's collection of the Debt owed to the gambling-credit collection conspiracy.  These statements are well-within the purview of Rule 801(d)(2)(A) and thus are admissible.  Additionally, none of these statements are testimonial, as they were not made to law enforcement or with any expectation of future judicial proceedings, and thus do not raise any Confrontation Clause issues.  See Stewart, 433 F.3d at 290.

D.     Co-conspirators Statements Are Admissible Against Both Defendants

At trial, the government intends to introduce a number of out-of-court statements made by the defendants and their co-conspirators that are relevant evidence of the charges, and either (i) do not constitute hearsay under the Federal Rules of Evidence, or (ii) are admissible as statements against penal interest.

Among other things, the government intends to introduce the following evidence at trial[10]:

---

[10]     The statements outlined herein are representative of those the government intends to introduce at trial as direct evidence; this list is not exhaustive, and the government reserves the right to introduce as evidence statements of a similar nature based on the cited caselaw that are not outlined here.

- Statements by the defendants as well as text messages and statements on recorded phone calls by co-conspirators evidencing the gambling-credit collection conspiracy, the gambling Debt incurred by John Doe #2 and Individual-1, and attempts to collect the Debt through extortionate means. These include statements made by the defendants to the Victims; and

- Statements by the defendants as well as text messages and statements on recorded phone calls by co-conspirators relaying and recounting Romanello's May 11 attack on John Doe #1 and other events surrounding Visit-3, including to intimidate other gamblers to repay debts owed as part of the gambling-credit collection conspiracy; and

- Statements by Celso and other co-conspirators regarding the withdrawal of John Doe #1's police report.

These statements are admissible against both defendants.

First, many of these statements are direct evidence of the defendants' participation in the gambling-credit collection conspiracy.

Here, members of gambling-credit collection conspiracy include defendants Romanello and Celso, Bexheti ███████████████████████████ and other individuals involved in the illegal gambling operation. Statements by the defendants and their co-conspirators regarding the gambling-credit collection conspiracy is direct evidence of the charged extortion conspiracy since to prove the conspiracy, the government must prove that the defendants agreed that their acts were aimed at collecting an extension of credit, which, as the evidence will show at trial, was the Debt accumulated through the illegal gambling operation.  See, e.g., Jan. 19, 2017 Call #12251 (John Doe #2 calls Bexheti to set up an account and Bexheti states "settle up on Wednesday because we don't want any trouble."); Feb. 27, 2017 Call #606 (Bexheti: "Tell him yeah we keep it open if you was down only 25 thousand for the week of course we keep it open you see us on Thursday whatever and you pay and then you keep going but if . . ." ████████ ████████████████████████████████████████ "); Mar. 3, 2017 Call #714 (Bexheti: "So I saw this piece of shit." ██████████ Bexheti: "He gave me . . . No no. He did pay me

17

seventy five hundred."); Mar. 6, 2017 Call #417 (Bexheti describes how gambling credit works and describes it like a "credit card").   Similarly, the defendants' and their co-conspirators' statements to certain of the Victims in attempt to collect the Debt are also direct evidence of the extortion conspiracy.  See, e.g., Feb. 28, 2017 Call #2966 (Bexheti telling John Doe #2 "you're putting me on the spot because they don't want to hear it" and "that's serious shit if he doesn't fucking have the money, you know what I mean.").

Statements by the defendants, Bexheti and other co-conspirators recounting Visit-3 and the withdrawal of the police report are also direct evidence of the charged crimes and admissible against both defendants.  See, e.g., May 14, 2017 Call #2182 (Bexheti to an unknown individual involved in the gambling operation ("Unknown Individual-1") stating, among other things, "the guy didn't pay umm Rom went in the back with him and talked to him . . . . So my boss. Fucking Rom is eighty years old.  Umm so Rom says you what bomb!  Bomb!  [i.e., a sound effect imitating a punch]  And my boss grabs him bomb!  Bomb!  And this guy starts screaming this is like six thirty in the evening man."); May 15, 2017 Call #18106 (Bexheti to Unknown Individual-1 describing how John Doe #1 withdrew the police report).  Moreover, Bexheti's statements to other debtors relaying what happened during Visit-3 to collect on debts from others in furtherance of the gambling-credit collection conspiracy is admissible as a co-conspirator statement and provides relevant background concerning Romanello's role in the conspiracy, namely threatening violence to collect on debts, which was publicized and known to those who gambled with Bexheti.  See, e.g., May 15, 2017 Call #18106, May 16, 2017 Call #2200 (Unknown: "Yeah.  No I'm like Two.  Two weeks behind."  Bexheti: "Yeah That's.  Yeah that's not good Georgie with them I swear."  Unknown:  "No the last two weeks was bad for me man."  Bexheti: "I hear you but Ahhh I'm telling you.  That's these guys just not him but his his Ahhh guys they

went into one guy who owed me money.  They went into the restaurant and fucking beat the fucking owner of the restaurant in front of everyone while the restaurant was open. . . .").

Additionally, each of these statements are either non-hearsay or fall within one or more hearsay exceptions.  First, the statements by the defendants, Bexheti, ████ and other co-conspirators in the gambling operation to one another and statements to the Victims regarding the accumulation and collection of the Debt are plainly co-conspirator statements in furtherance of the gambling-credit collection conspiracy and, thus, are excluded from the hearsay bar pursuant to Rule 801(d)(2)(E).  For example, Bexheti's February 2017 call to John Doe #2 telling him "you're putting me on the spot because they don't want to hear it" and "that's serious shit if he doesn't fucking have the money, you know what I mean" are in furtherance of the extortionate scheme as they are threatening communications with a Victim about the collection of the Debt.  Milstein, 401 F.3d at 72 ("Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators.").  As another example, the jury can reasonably infer that Bexheti's statements on a March 7, 2017 call with John Doe #2 in which he is trying to find out Individual-1's address, see Mar. 7, 2017 Call #4671, is in furtherance of the conspiracy because they were meant to "prompt the listener to respond in a way that facilitates the carrying out of criminal activity"—namely visiting Individual-1 at his home in order to collect the Debt.  These are two examples of calls by co-conspirators discussing the collection of the Debt that the government intends to introduce.  Other calls by and among co-conspirators that discuss the accumulation and collection of the Debt are similarly admissible for the reasons outlined herein.  Likewise statements by Romanello in furtherance of the collection of the Debt, including his demands for payment, are admissible against both defendants.

19

Second, the defendants and their co-conspirators statements, including those of Bexheti and ███████ on May 11, 2017 and in the days thereafter reacting to and discussing Visit-3 are also co-conspirator statements admissible against both defendants.   These include conversations between Bexheti and ███████ in which they discuss ignoring phone calls from John Doe #1 after John Doe #1 was punched by Romanello.  The content of these calls, and other similar communications updating members of the conspiracy of what took place during Visit-3 (as excerpted above in the calls between Bexheti and Unknown Individual-1), highlight coordination among co-conspirators after Visit-3 and are admissible co-conspirator statements.   See Mulder, 273 F.3d at 103 (admission of co-conspirator's statements narrating conversations between members of the conspiracy was proper because it kept fellow co-conspirators apprised of the arrangements for their extortion scheme).

Moreover, Bexheti's narrative of the extortionate acts taken by Romanello and others during Visit-3 are not only admissible as co-conspirator statements in furtherance of the gambling-credit collection conspiracy, but also statements against penal interest, and thus, also admissible pursuant to Rule 804(b)(3).   For example, in addition to the calls between Bexheti and Unknown Individual-1 outlined above, in another intercepted call made by Bexheti to Unknown Individual-1 the day after John Doe #1 was punched by Romanello, Bexheti explains that his "boss" ███████████████ told him to "shut the phone" "most of the day" because he is "getting a hundred thousand phone calls" concerning "some fucking Albanian guy" who "went out of line" and "they fucking smacked [] around his own restaurant."  See May 12, 2017 Call #17452.  Two days later, Bexheti again calls Unknown Individual-1 and tells him that "Rom[anello] is Tony's right hand guy" and that Romanello and Bexheti's "boss" went to John Doe #1's steak house because John Doe #1's "nephew owe us money" but "didn't pay" and again

recounts that Romanello hit John Doe #1 and that Behexti's "boss grab[bed] him [John Doe #1]." See May 14, 2017 Call #2182.[11]   These admissions are patently against the declarant's penal interest as they implicate Bexheti's involvement in the gambling-credit collection conspiracy and the extortionate means used to collect the Debt.

Lastly, Celso's statements to Individual-2 that John Doe #1 should withdraw his police complaint against Romanello or the situation could escalate are admissible as non-hearsay statements, since they are not being admitted for the truth of the matter asserted—i.e., that the situation would in fact escalate.  In addition, these statements are co-conspirator statements in furtherance of the charged extortionate collection of credit conspiracy, and are admissible against Celso and his co-conspirator and co-defendant, Romanello.  These statements were intended to conceal the conspiracy from law enforcement  and thereby preserve the continuity of the conspiracy's operations until the Debt was collected in full.

E.     Additional Portions of Defendants' Statements Are Inadmissible If Offered by Defendants

Further, the Court should preclude the defendants from admitting other portions of their statements, either on cross-examination or in their case-in-chief, because such testimony would constitute hearsay without any exception.  It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial.  See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake,

---

[11]     Because Bexheti was not present at Visit-3, his statements regarding the incident constitute hearsay within hearsay.  However, according to the May 12, 2017 intercepted call, Bexheti was informed about what occurred at Visit-3 from ███████████ ████████████████.  Therefore, Bexheti's statements in the intercepted calls are admissible as statements against penal interest and ███████ recounting of the event to Bexheti is admissible as a co-conspirator statement.

195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("'[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.'" (alteration in original; quoting Marin, 669 F.2d at 84).  Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay."  United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) (internal quotations omitted); see also United States v. Yousef, 327 F.3d 56, 153 (2d Cir. 2003) (holding that "while the Government was free to introduce the statement as an admission by a party-opponent, [the defendant] had no right to introduce it on his own" (citations omitted)).  As the Sixth Circuit has explained, were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).  A defendant may offer his prior statements in an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination."  United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind.  The state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed."  Fed. R. Evid. 803(3).  The state of mind must be relevant, and the statement cannot be offered for any underlying truth independent of the state of mind.  See Funk v. Belneftekhim, No. 14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. Nov. 30, 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind

independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant."). "The exclusion of statement[s] of memory or belief [proffered] to prove the fact remembered or believed is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991) (alterations in original; internal quotations omitted). The statement must be forward-looking and not backward-looking. See id. (citing Shephard v. United States, 290 U.S. 96, 104 (1933), for proposition that statement, "Dr. Shephard has poisoned me," is not admissible as an existing state of mind because it was backward-looking).

Such testimony is also not admissible pursuant to the rule of completeness. Under Federal Rule of Evidence 106, courts only permit inclusion of otherwise hearsay testimony where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact." United States v. Gotti, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006). Self-serving exculpatory statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence." United States v. Harper, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009). Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements. See United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); United States v. Johnson, 507 F.3d 793, 796 (2d. Cir. 2007) (affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he

23

admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted

portion related to the execution of the robbery" (emphasis omitted)).  As the Second Circuit has

explained, a defendant may not introduce other parts of the same statement offered in part by the

government unless the defendant makes a proper showing that the statements he seeks to

introduce have a separate basis for admission.  See United States v. Jackson, 180 F.3d 55, 73 (2d

Cir. 1999) (rejecting claim under the completeness doctrine that later portions of conversation

provided relevant context and noting that "the portions of the tape proffered by [defendant]

consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible

hearsay").  The completeness doctrine does not "require the admission of portions of a statement

that are neither explanatory of nor relevant to the admitted passages."  Johnson, 507 F.3d at 796

(citations omitted).

II.     Intercepted Phone Communications May Be Authenticated Through Testimony of a
        Witness Familiar with a Speaker's Voice

        As described detail above, the government will move to admit statements from

intercepted recordings from a judicially authorized wiretap which monitored telephones belonging

to both Bexheti and ███████ during the relevant time period in its case-in-chief.[12]  The government

intends to authenticate these recordings through a witness who will identify the participants on the

call through voice identification pursuant to Federal Rule of Evidence 901.

        Rule 901(a) states that "the requirement of authentication or identification as a

condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the

---

[12]     The wiretap will be admitted through custodians of records from the Office of the
Queens County District Attorney ("QCDA") as well as the New York City Police Department
("NYPD").  More specifically, a member of the NYPD's Technical Assistance Response Unit is
anticipated to testify about the collection of the data and the interception of the phone
communications.  A QCDA custodian may also testify as to the manner in which that data was
stored at the QCDA's Office.

matter in question is what its proponent claims."  Likewise, Rule 901(b) provides a non-exhaustive list of the types of evidence that can be used to authenticate particular kinds of evidence.  Among other things, Rule 901(b) provides that "[a]n opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker" satisfies Rule 901(a)'s requirement for authentication and identification.  Id. at (b)(5).

As courts applying Rule 901 have repeatedly made clear, the rule "does not erect a particularly high hurdle," and indeed, the rule's requirements are satisfied so long as "a reasonable juror could find in favor of authenticity or identification."  United States v. Dhinsa, 243 F.3d 635, 659 (2d Cir. 2001) (citations omitted); see United States v. Moreno, 108 F.3d 1370, 1997 WL 138435, at *3 (2d Cir. 1997) (officer testimony identifying the defendant's voice was admissible, even where officer had previously misidentified the defendant's voice, because the jury "could find" that it was the defendant's voice on the recording); United States v. Albergo, 539 F.2d 860, 863-64 (2d Cir. 1976) (voice-identification testimony is admissible if a "reasonable" jury could find the identification accurate); see also United States v. Ortiz, 776 F.3d 1042, 1044-45 (9th Cir. 2015) (explaining that Rule 901(b) "establishes a low threshold for voice identifications").  Once the threshold prescribed by Rule 901 is met—and assuming the evidence being offered is otherwise admissible—how much weight to give the evidence is solely a question for the jury.  Moreno, 1997 WL 138435, at *3;  Albergo, 539 F.2d at 864; Ortiz, 776 F.3d at 1045.

With respect to voice identifications in particular, case law makes clear that a witness identifying a voice at trial need only have "heard the voice of the alleged speaker at any time."  United States v. Huang, 101 F.3d 1392, 1996 WL 387221, at *2 (2d Cir. 1996) (quoting United States v. Cambindo Valencia, 609 F.2d 603,640 (2d Cir. 1979)); see Ortiz, 776 F.3d at

1045 (a witness need only be "minimally familiar with the voice" being identified); <u>Dhinsa</u>, 243 F.3d at 659 (noting that a speaker's identity on a telephone call can be established by "circumstantial evidence"); <u>Moreno</u>, 1997 WL 138435, at *3 (finding that district court properly allowed police officer to identify defendant's voice on recording in which defendant discussed selling drugs, even where he had previously misidentified the defendant's voice); <u>Albergo</u>, 539 F.2d at 864 (explaining that a witness can identify a speaker on a phone call even if the witness has never met the speaker).

The government respectfully requests that the Court find that certain intercepted communications the government seeks to admit are authentic as a threshold matter, should a witness identify the voices on the intercepted phone calls at trial.

III.   <u>Evidence of the Defendants' Reputation and the Reputation of Co-Conspirators is Admissible</u>

In the government's case-in-chief it intends to introduce limited evidence of the defendants' reputation and that of their co-conspirators, primarily through the Victims' knowledge of the defendants' reputation.  This includes evidence that the Victims knew the defendants to be members of organized crime and associated with other known members of organized crime.  If, on cross-examination, defense counsel attempts to impeach the witness's credibility on this point, the government intends to introduce specific examples that underpin the Victims' belief that the defendants were associated with organized crime.

As the Second Circuit has explained, and as further described above, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." <u>United States v. Gonzalez</u>, 110 F.3d 936, 941 (2d Cir. 1997).  As such, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." <u>Id.</u>; <u>see also</u> Fed. R. Evid. 401 and 402.

26

It is well settled that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inexorably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting Gonzalez, 110 F.3d at 942); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same); 2 Weinstein's Federal Evidence § 404.12[3] at 404-34.2 to 404-34.3 (Joseph M. McLaughlin, ed., 2d ed. 2003).

In this case, the defendants' association and membership in the Genovese crime family of La Cosa Nostra is inexorably intertwined with the crime of extortion with which the defendants are now charged. The Court should permit the government to introduce limited evidence regarding the Victims' belief that the defendants were associated with organized crime, and, if government's witnesses credibility on this issue is a subject of impeachment during cross-examination or the defendants' association with organized crime is otherwise contested, specific acts the Victims believed the defendants to have been involved in.  This would include, for example, one Victim's belief that Romanello was previously involved in an extortionate collection of credit.  Such evidence is highly relevant to the defendants' state of mind and whether the Victims of the charged extortion would reasonably have been placed in fear.

"Extortion" for the purposes of Title 18, United States Code, Section 894, "includes any act or statement which constitutes a threat if it instills fear in the person to whom [the threat is] directed or [is] reasonably calculated to do so in light of the surrounding circumstances." United States v. Pacione, 738 F.2d 567, 572 (2d Cir. 1984) (quoting United States v. Sears, 544 F.2d 585, 587 (2d Cir. 1976)) (modification omitted); see also United States v. Natale, 526 F. 2d 1160, 1168 (2d Cir. 1975); United States v. Curcio, 310 F. Supp. 351, 357 (D. Conn. 1970); 18

27

U.S.C. § 891(7) (defining "[a]n extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.").  As the Second Circuit has observed, the rationale behind this broad definition of extortion under Sections 892 and 894 is best understood against the backdrop of Congress's efforts to combat organized crime.  Pacione, 738 F.2d at 570.  For example, as the Pacione court observed, due to the nature of organized crime families and organizations, "loan sharks connected with organized crime rarely used force, or even made explicit threats to do so, because they found it unnecessary. A loan shark's victim knew all too well that if he did not pay, a likely result would be bodily harm to him or his family." Id.

Accordingly, to evaluate whether conduct comprises an extortionate threat, all of the surrounding circumstances must be considered. Significantly, "it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed." Natale, 526 F.2d at 1168; see also United States v. Polizzi, 801 F.2d 1543, 1548 (9th Cir. 1986) (observing that it is the defendant's actions, "not the mental state produced in the debtor" that is the focus for the jury).  Important to the instant analysis, evidence of a defendant's reputation "may be used to show the state of mind of both the defendant and the victim."  United States v. Dennis, 625 F.2d 782, 800 (8th Cir. 1980).  As the Dennis court explained,

> If a man makes vaguely menacing statements, aware that he is commonly known as a violent man, then it is a reasonable inference that he intends to instill fear. . . . It is unlikely that the defendant is unaware of his own reputation for violence; reputation, by definition, reflects general knowledge in the community, and, if anyone is a member of the relevant community, it is the defendant himself.

Id. at 800 (quoting Goldstock & Coenen, Controlling the Contemporary Loanshark: The Law of Illicit Lending and the Problem of Witness Fear, 65 Cornell L. Rev. 127, 200-01 (1980)); see also

Pacione, 738 F.2d at 572 (citing Dennis and Goldstock & Coenen).

        In this case, the government seeks to admit limited evidence that the defendant's reputation in the community is that they are "wiseguys." This evidence is directly relevant to the charged extortion as it tends to show an implied threat of violence in Romanello's continued demands for repayment and Celso's demand that the police report be rescinded. Further, evidence of the defendants' association with La Cosa Nostra reveal each defendant's state of mind, including what each defendant understood his threats to mean to the Victims given his own association.

        It is well settled that Section 894 does not require that a victim actually be placed in fear. Natale, 526 F.2d at 1168; see also Polizzi, 801 F.2d at 1548 (observing that "[t]he person to whom threats are made could be a government agent, or not be in actual fear for some other reason, and yet a section 894 violation could occur"). Rather than having to prove actual fear, the government can meet its burden by establishing that the defendant intended to make a threat and that a reasonable person would have been afraid under all of the surrounding circumstances. Natale, 526 F.2d at (noting that "it is the threat of harm which is prohibited by 18 U.S.C. § 894, and actual fear is not an element of the offense."). Here, Romanello's continued demands for repayment, along with the physical altercation that took place on May 11, Celso's threat that John Doe #1 needed to withdraw the police report against Romanello or the situation would escalate, and both defendants' reputation in the community as "wiseguys," make clear that the defendants intended to instill fear in the Victims to ensure repayment of the Debt.

        Thus, in light of all of the surrounding circumstances, the actions and demands made by the defendants, in the context of the defendants' reputations of their association with La Cosa Nostra, a reasonable debtor in the Victims' positions would undoubtedly have been placed in fear by the defendants' actions and the actions and statements of the defendants' co-conspirators.

Accordingly, the evidence of the defendants' relationship to organized crime constitutes important circumstantial evidence to show the state of mind of the defendants and their Victims.  See Dennis, 625 F.2d at 800; Pacione, 738 F.2d at 572; United States v. Melia, 2011 WL 3880922, at *3 (D. Conn. Sept. 2, 2011) ("[R]eputation is admissible insofar as it forms the basis of an implied threat. Evidence of a defendant's violent character and connections with violent acquaintances are relevant to whether he intended his statements to be taken in the context of his violent reputations so as to constitute an implicit threat.") (citations omitted); Polizzi, 801 F.3d at 1555-56 (noting that "[e]vidence of a defendant's violent character and connections with violent acquaintances are relevant to whether he intended his statements to be taken in the context of his violent reputations so as to constitute an implicit threat.").

IV.     Evidence or Argument Suggesting Selective Prosecution or Impugning the Government's Investigatory Conduct Should Be Precluded

The defendants should be precluded from introducing evidence or making arguments before the jury that seek to impugn or otherwise put at issue the government's conduct or motive in its prosecution of this matter.  In particular, the government respectfully requests that the Court preclude the defendants from introducing evidence or argument concerning law enforcement and prosecutor motives in prosecuting members of organized crime families, including the defendants.[13]   Romanello has already raised allegations that the criminal charges

_____

[13]     Romanello and his counsel have raised a similar argument in other criminal cases. See United States v. Anthony Antico, No. 08-CR-559 (CBA), ECF No. 310, July 14, 2010 Trial Transcript at 17:4-13 (Mr. McMahon: "For law enforcement, the Mafia is a virtual mother's milk. You get publicity, you get promotions, agents get promoted, prosecutors became mayors, governors, whatever. And because of the lure and the allure of the Mafia and the prosecutions, what sometimes is just an ordinary street crime a robbery, a gambling, by ordinary street criminals, becomes something different, something bigger. . . ."); see also United States v. Anthony Romanello, No. 10-CR-929 (S-1) (ILG), ECF No. 92, July 30, 2012 Pretrial Conference Transcript at 14:20-15:3 (Mr. McMahon: "So I think that that is a proper area for cross-examination because

against him are a result of "prosecutorial vindictiveness," ECF No. 48 at 5, which the Court properly rejected, see ECF No. 57 at 5-11. Such evidence and argument are irrelevant to the defendants' innocence or guilt and presents a substantial risk of misleading the jury or inviting jury nullification.

Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial, and improperly invite jury nullification. See, e.g., United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand other things they could have done is wholly irrelevant" (internal quotations and alterations omitted)); United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); United States v. Preldakaj, 456 F. App'x 56, 60 (2d Cir. 2012) (affirming instruction that "[y]ou have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern"); United States v. Knox, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" is "appropriate"

---

it shows a motive to falsify and I think, Judge, that with regard to—I used the phrase in Antico, mother's milk for prosecutors and agents, the Mafia, it is a bit of rhetorical, but I think it's true . . . nothing gets a prosecutor advance or an agent advance or gets the media out in greater full glory than a Mafia case.")

(internal quotations omitted)).

That is so because a claim that a prosecution has been brought selectively, or from improper motives, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 463 (1996). "Because it involves a defect in the institution of the prosecution, the selective prosecution defense is an issue for the court rather than the jury." United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (internal quotations omitted).

Courts consistently exclude a defendant's attack on the prosecution's motivation or methods in initiating its prosecution, including arguments that a defendant was improperly targeted. See, e.g., United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); United States v. Loera, No. 09-CR-466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) ("[S]elective-prosecution argument by defendant to the jury would . . . be improper"). The Court should do the same here. See United States v. Jeffrey Webb, et al., No. 15-CR-252 (PKC), ECF No. 1275, Trial Transcript at 3630:09-3632:12 ("[M]aking argument in the vein of selective prosecution or the government's motive in conducting its investigation; for example, not getting certain evidence or pursuing certain leads and potentially focusing on certain defendants is . . . inappropriate" at trial.).

The jury's attention belongs on "the evidence or lack of evidence that had been presented at trial," Saldarriaga, 204 F.3d at 52, not on the government's investigative decisions or motives. Evidence concerning such matters is irrelevant, and introduction of evidence or argument concerning the timing or motives behind the government's investigation would, in addition,

present an unacceptable risk of confusing the issues and misleading the jury.  The Court should preclude any such evidence or argument.  See, e.g., United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); United States v. Reese, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant 'may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.'") (quoting United States v. Demosthene, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).

V.      Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits To Be Introduced
        During the Government's Case

        The government also respectfully request that the Court order the defendants to disclose Rule 16(b) discovery and defense exhibits to be introduced during the government's case. Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).  Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16.  As explained in United States v. Hsia, No. 98-CR-57 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

        A "case-in-chief" is defined as "[t]he part of a trial in which a party
        presents evidence to support its claim or defense." Black's Law
        Dictionary 207 (7th ed. 1999). Defendant's cross-examination of
        government witnesses, and the evidence introduced during that
        cross-examination, certainly may be used to support her defense . .
        . . The cross-examination of these and other government witnesses

33

> therefore is properly seen as part of defendant's case-in-chief if it
> buttresses her theory of the case.

The <u>Hsia</u> court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." <u>Id.</u> at *2 n.1.

Courts in this district have repeatedly held that the defense must produce in advance any "exhibit that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination of a government witness. <u>United States v. Smothers</u>, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); <u>see also</u> <u>United States v. Napout</u>, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant."). That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit. <u>See</u> <u>Smothers</u>, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody"). Numerous other district courts have interpreted Rule 16(b) similarly.  <u>See</u> <u>United States v. Swenson</u>, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross-examination of a government witness other than for impeachment purposes."); <u>United States v. Holden</u>, No. 13-CR-444, 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015) (holding, based on <u>Swenson</u> and <u>Hsia</u>, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); <u>United States v. Larkin</u>, No. 12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in

34

Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same); United States v. Huntress, No. 13-CV-199S, 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests").

Here, to date, the defendants have not disclosed any document they intend to introduce at trial. Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendants to identify any defense exhibits they intend to introduce during the government's case (i.e., not those documents to be used for impeachment purposes only) or any defense case no later than the start of the trial.

VI.     Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded

In accordance with its obligations under 18 U.S.C. § 3500, the government will produce summaries of witness interviews prepared by law enforcement.  The government respectfully requests that the Court preclude the defense from introducing the contents of these reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

A party may impeach a witness with a prior inconsistent statement of that witness, but the statement must be the witness's own statement that he or she either made or adopted.  See Fed. R. Evid. 613; United States v. Alamonte, 956 F.2d 27, 29 (2d Cir. 1992) (concluding that the trial court did not err in refusing to admit prosecutor's notes taken during debriefing of witness and explaining that a "third party's characterization" of a witness's statement thus does not constitute a prior statement of that witness "unless the witness has subscribed to that characterization" or, in other words, endorsed it); United States v. Leonardi, 623 F.2d 746, 757

(2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]," it was "properly rejected as a prior inconsistent statement").  As the Second Circuit has explained, the problem with using a third party's summary or characterization of the witness's statement to impeach is "one of relevancy": "If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible."  Alamonte, 956 F.2d at 29.

Notably, the Jencks Act governs the discoverability of a witness's prior statements, and its definition of "statement" accords with Fed. R. Evid. 613(a) and applicable case law on proper impeachment using prior inconsistent statements.  Under the Act, a statement means "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is substantially [a] verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury.  See 18 U.S.C. § 3500(e).  As the Supreme Court has explained, because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment."  Palermo v. United States, 360 U.S. 343, 349, 352 (1959).  And the Court further noted that an "agent's interpretations and impressions" of a witness do not fall within the purview of the Act.  Id. at 352-53.

In this case, the government has provided the defense with broad discovery, which will be supplemented when the government provides material pursuant to 18 U.S.C. § 3500, including reports summarizing investigators' interviews with government witnesses.  These reports were not reviewed or adopted by any of the government witnesses.  Moreover, they were finished after interviews were completed and reflect the thought processes and interpretations of

the agents and officers; they do not constitute verbatim recitals or transcripts of any of the witnesses' statements.[14]  As a result, the statements in these reports are not statements of any of the government's witnesses (other than the reports' authors, if called to testify at trial), cannot be used for impeachment, and should not be read aloud or shown to the jury.[15]  See Alamonte, 956 F.2d at 28; Leonardi, 623 F.2d at 757.  The Court should therefore preclude any use or suggestion by defense counsel that a statement in a law enforcement summary report is a statement of the witness being interviewed.

VII.    Certain Business and Public Records Are Admissible

At trial, the government intends to introduce the following certified business records: AT&T subscriber and toll records, Yaana subscriber and toll records, Verizon subscriber and toll records, Chase Bank records of certain Victims' bank accounts and Rite Aid Pharmacy video surveillance footage.  The underlying certifications, which are attached hereto as Exhibits 2-6, have already been provided to the defendants in discovery.  The government will produce additional certifications as they become available.

The defendants' co-conspirators used their cellular telephones to communicate in the relevant time period.  In addition, the Victims used their cellular telephones to communicate with each other and with the defendants and their co-conspirators during the

---

[14]    These reports would, however, constitute prior statements of the agents or officers who prepared the report if they are called as a witness to testify regarding the subject matter contained in the report.

[15]    The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report.  However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement.  Additionally, if appropriate and with proper foundation, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish its contents to the jury.

same time period.  Accordingly, the government intends to introduce at trial the subscriber information and toll records associated with those cellular telephones.  See, e.g., RBC000108-112; RBC000424-972; RBC000977-986.  The documents from Chase Bank, RBC000308-423, and Rite Aid Pharmacy, RBC000113, are relevant to show the repayment of the Debt and corroborate the extortionate scheme. All of these records are records kept in the ordinary course of business; the government intends on introducing through certifications that these records are true and complete copies of the records kept in the ordinary course of business.  See Fed. R. Evid. 803(6) and 902(11).

The government also intends to offer excerpts of New York State Department of Motor Vehicle ("DMV") records for Romanello, Celso, Bexheti, ███████████, which include, but are not limited to photographs, prior applications including addresses and phone numbers information, and prior address records.  The government expects that these records will be relevant to prove co-conspirators' identities, telephone numbers, and home addresses.  The government will produce these records to the defendants as soon as they become available.  These records are admissible both as business records, as discussed above, and self-authenticating public records under Federal Rule of Evidence 902(1).

The Supreme Court has held that admitting business records and public records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).   The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial."  Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have

concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).   As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." 460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.   Courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents). Similarly, Rule 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficient laid foundation for admission of bank records).  Thus, "Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an

39

oral one.'" United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013) (summary order) (citing 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008)).

        Likewise, under Federal Rule of Evidence 902(1), domestic public documents are self-authenticating and "require no extrinsic evidence of authority in order to be admitted" so long as they bear "a seal purporting to be that of the United States" or "any state" of the United States and bear a "signature purporting to be an execution or attestation."

        The government should be permitted to authenticate and admit the relevant AT&T, Yaana, Verizon, Chase Bank, Rite Aid, DMV and other business or public records using certifications because it is proper under the law.  The government intends to offer these records at trial under Rules 803(6)(D), 902(1), 902(11) and 902(13) pursuant to the attached certifications that meet the requirements of Rule 803(6)(A)-(C).  See Exs. 2-6.  As noted, the government has provided the defendants, and will continue to provide as they become available, the certifications and underlying business and public records in discovery, and the defendants are hereby informed of the government's intention to offer them as evidence at trial.  Such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial which is an efficiency that is particularly important in light of ongoing concerns about COVID-19.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating business and public records.

        Accordingly, the government respectfully requests that the Court admit the above referenced business records at trial pursuant to Rules 803(6)(D), 902(1), 902(11) and 902(13).

VIII.   Evidence or Argument Concerning Possible Punishment and Collateral Consequences Should Be Precluded

        The government moves to preclude any discussion or argument concerning possible collateral consequences or punishment which may result from a conviction in this case.  Such argument or evidence is irrelevant and therefore inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").   Any reference during trial to possible punishment may only "prejudice, distract, or confuse the jury."  United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *3 (E.D.N.Y. Jan. 14, 2020) (citing Shannon v. United States, 512 U.S. 573, 579 (1994)).  Accordingly, "[f]ederal courts usually instruct juries not to consider a verdict's consequences."  United States v. Blume, 967 F.2d 45, 49 (2d. Cir. 1992) (citing Rogers v. United States, 422 U.S. 35, 40 (1975)).

        The Court should preclude the defendants and their counsel from referencing the possible punishment or consequences which will accompany a guilt verdict.  Although the defendants have not stated their intention to reference the possible consequences of their convictions at trial, the government moves to preclude any mention of sentence out of an abundance of caution.  Any reference to sentencing will serve to confuse the jury and undermine its role as the trier of fact.  Discussion of the consequences of a conviction could invite the jury to consider nullification, a violation of the Court's instructions and an outcome the Court is duty bound to prevent.  United States v. Thomas, 116 F.3d 606, 616 (2d Cir. 1997).  Therefore, the Court should preclude the defendants from referencing potential punishment or collateral consequences at trial.

41

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions in limine.

Dated:      Brooklyn, New York
            October 6, 2023

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                              By:        /s/
                                        _____
                                        Dana Rehnquist
                                        Irisa Chen
                                        Assistant U.S. Attorneys
                                        (718) 254-7000